IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMON EVERETT HOLMBERG,<br><br>Defendant. | Case No. 3:23-cr-00206<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

The United States of America, by Jennifer Klemetsrud Puhl, Acting United States Attorney, hereby submits its sentencing memorandum for this Court's consideration.

## I.    Introduction

The Presentence Investigative Report (PSIR) calculates Defendant Raymon Holmberg's offense level at 21 and his criminal history as I, yielding an advisory range of 37-46 months. The United States requests that the Court adopt the guideline calculation as set forth in the PSIR and impose a sentence within the guideline range, rather than a sentence of time served. (Doc. 52, ¶ 41.)

The nature and extent of Holmberg's criminal conduct—his persistently flying to a foreign country to engage in commercial sex with some of the most vulnerable boys in the world; his manipulation of a teenage, Canadian boy to produce sexually explicit images; his long history of leveraging his power and influence as a high school guidance counselor and a state legislator to exploit adolescent-age boys and men; and his insatiable sexual appetite for sex workers throughout the United States all necessitate a within-guideline sentence.  Although Holmberg is presently 81 years of age, his more recent travels to Slovakia and Czech Republic to engage in commercial sex with boys reflect that he still poses a risk of danger, and as such, a sentence of time-served is not appropriate.

Accordingly, the United States respectfully requests that the Court impose a sentence of 37 months, within the advisory range of the Guidelines.  (Id. at ¶ 80.)

## II.     A Guideline Sentence Meets the 18 U.S.C. § 3553 Requirements

The Eighth Circuit has directed district courts to follow a three-step process in determining the appropriate sentence.  United States v. Solis-Bermudez, 501 F.3d 882, 884 (8th Cir. 2015).  First, the district court must calculate the appropriate guideline range based upon the applicable offense level and the criminal history category.  Id.  Next, it must decide if the guidelines permit a traditional departure.  Id.  And finally, the district court must determine whether the 18 U.S.C. § 3553(a) factors justify a variance from the sentencing guidelines.  Id.

In determining whether to impose a within-guideline sentence, the sentencing court may consider, without limitation, any information concerning the background, character, and conduct of the defendant. See 18 U.S.C. § 3661; USSG § 1B1.4.  Historically, federal courts have exercised broad discretion to consider all relevant information at sentencing, "consistent with their responsibility to sentence the whole person before them." United States v. Hogue, 66 F.4th 756, 764 (8th Cir. 2023).  This may include dismissed or uncharged criminal conduct, as the facts underlying both relate to a defendant's background and character. Id. At 765.  "In sentencing, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." United States v. Gant, 663 F.3d 1023, 1029 (8th Cir. 2011) (cleaned up).

In the event that certain important facts are in dispute, the court must provide the parties an adequate opportunity to present information to the court regarding those facts.  United States v. Combs, 44 F.4th 815, 817 (8th Cir. 2022) (finding that district court committed procedural error when it used disputed facts relative to dismissed counts in PSIR to sentence defendant).  In resolving any factual disputes, the Court may consider relevant information without regard to its

2

admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.  See USSG § 6A1.3; Grant, 663 F.3d at 1029 (stating that the relevant information need not be admissible under the Federal Rules of Evidence).  In the end, the court shall impose a sentence that is sufficient, but not greater than necessary to meet the sentencing goals set forth in § 3553(a). United States v. Jones, 71 F.4th 1083, 1087 (8th Cir. 2023) (finding that district court's imposition of a within-guidelines-range was substantially reasonable).

### A.    Nature and Circumstances of the Offense

Holmberg did not merely commit one criminal act. Rather, he stands convicted of repeatedly traveling to Prague, Czech Republic for the purpose of engaging in commercial sex with underage boys.  Since 2011, he took more than 14 trips to Prague where he frequented a brothel that catered to homosexual men who were looking to engage in commercial sex with adolescent-age boys; expressly requested others to obtain boys for the purpose of engaging in commercial sex; and frequented a park adjacent to Wenceslas Square, a location where he purchased the services of adolescent-age boys for the purpose of sexual activity.  Holmberg traveled directly to Prague on the following occasions:

| DEPARTURE | RETURN | DESTINATION |
|---|---|---|
| June 24, 2011 | July 5, 2011 | Prague, CZ |
| September 29, 2011 | October 4, 2011 | Prague, CZ |
| April 19, 2012 | May 3, 2012 | Prague, CZ |
| August 14, 2012 | August 20, 2012 | Prague, CZ |
| September 6, 2013 | September 17, 2013 | Prague, CZ |
| May 14, 2014 | May 26, 2014 | Prague, CZ |
| October 25, 2015 | November 3, 2015 | Prague, CZ |

| April 26, 2016 | May 2, 2016 | Prague, CZ |
|---|---|---|
| October 23, 2016 | November 1, 2016 | Prague, CZ |
| May 3, 2017 | May 9, 2017 | Prague, CZ |
| September 28, 2018 | October 6, 2018 | Prague, CZ |
| June 23, 2019 | July 3, 2019 | Prague, CZ |
| September 23, 2020 | October 6, 2020 | Prague, CZ |
| August 27, 2021 | September 5, 2021 | Prague, CZ |

North Dakota Bureau of Criminal Investigations (BCI), Special Agent (SA), and forensic examiner, Jesse Smith conducted an extensive search of Holmberg's devices as well as an email account in the name of "Sean Evan's,"[1] an alias used by Holmberg to communicate with certain colleagues and friends about his sexual interest in adolescent-age boys, among other things. This search revealed that Holmberg discovered the Villa Mansland, a homosexual brothel, in 2011. On May 7, 2011, Holmberg invited Cooperating Witness 1 (CW1) to join him on a trip to Prague for the specific purpose of visiting the Villa Mansland. Holmberg sent CW1 an email with a subject line "Let's go. This summer." The email, dated May 7, 2011, included a link to the Villa Mansland with the following text: **"I do wanna go . . . wouldn't it be fun. The boys rent at around $60 . . . (sex is extra)** lol how was Korea?" CW1 responded: "I'm in for a fun eastern Europe trip. Let's get flight planned." Holmberg in turn responded: "It will be decadent but oh

---

[1] In an email dated February 5, 2011, Holmberg wrote to Cooperating Witness 1 using the seanevan@hotmail.com account that he communicates with "good friends" using the "Sean Evan" alias account: "this is my private account which I communicate with [******] and good friends . . . . We will keep in touch . . ."

so much fun bro. **what happens in Prague -Stays in Prague.**"  Thereafter, Holmberg and CW1 made arrangements to travel to Prague.

In the meantime, Holmberg, using his alias "Sean Evan," emailed an unidentified individual the following on May 24, 2011:  "I've been traveling . . . going home today for first time in 3 weeks**. going to Kosovo and Prague next month.**  [T]hat should be fun ... **age of consent in Prague is 15 . . . ouch lol."**  In response, this unidentified individual wrote" "**Uff so you maybe find a kid for your pleasure?** "  Holmberg in turn responded that he received more pleasure from this unidentified individual, but that he would **"still 'look' for some young kid**."

Holmberg's emails and law enforcement interviews with those who occasionally traveled with Holmberg revealed that Holmberg chose to travel to Prague because he was looking for anonymity while engaging in commercial sex with underage boys.  That is, he used the alias "Sean Evan" for more than a decade while he traveled throughout the Czech Republic and Slovakia.  On May 28, 2011, Holmberg and CW1 exchanged emails about their accommodations at the Villa Mansland.  In advance of their trip, Holmberg, using his alias email account "Sean Evan," forwarded CW1 numerous emails he received from the Villa Mansland about its "hosts of the month," which emails depicted images of adolescent-age boys.

Homeland Security Investigations (HSI) Special Agent (SA) Dan Casetta eventually interviewed CW1.  During these interviews, CW1 admitted to traveling to Prague with Holmberg in 2011, during which time he observed others refer to Holmberg as "Sean."  CW1 admitted to having stayed at the Villa Mansland with Holmberg while in Prague.  CW1 explained that he paid for his and Holmberg's rooms because Holmberg did not want his name on the hotel registry due to the fact that he was a North Dakota Legislator.  According to CW1, Holmberg traveled to Prague to have sex with prostitutes at the Villa.   Of course, CW1 did not know the exact ages of these prostitutes, but he acknowledged that they were potentially underage based

5

upon their appearance. CW1 was aware that Holmberg liked the company of young males, and according to CW1, Holmberg told him the age of consent was 16 years in Prague, unless it was for the purpose of commercial sex in which case it was 18 years of age.

CW1 also stated that while in Prague, Holmberg showed him Wenceslas Square Park, where Holmberg would pick up prostitutes. Although CW1 did not see any prostitutes in the park on the day he walked through it with Holmberg, CW1 knew Holmberg liked to go there because the prostitutes were young. After CW1 and Holmberg returned home from their trip to Prague, Holmberg told him something to the effect of: "if you think I travel thousands of miles to have sex with a 16-year-old, you'd be right."

The investigation further revealed that Holmberg traveled to Prague with a University of North Dakota student, who law enforcement later identified as Cooperating Witness/Victim 2 (CW2). While in Prague with Holmberg in 2016—roughly five years after he first discovered the Villa Mansland—CW2 reported to HSI that other individuals were still referring to Holmberg as "Sean Evan" and Holmberg instructed CW2 to do the same while they were in Prague together. CW2 stated that in advance of their trip, Holmberg sent him information about "some sort of Villa," located outside the city of Prague, where one could hire a prostitute. Because Holmberg shared stories with CW2 about his engaging in commercial sex throughout the United States, he knew that Holmberg's purpose in traveling to Prague was very specific: to engage in commercial sex with even younger males.

CW2 also reported to law enforcement about his and Holmberg's activities while in Prague. They traveled separately to Prague and later met at Hotel Julis on Wenceslas Square, which is located next to the park CW1 mentioned, where CW2 observed young male prostitutes between the ages of 12 and 16. During their first night in Prague, Holmberg met a young man, whom Holmberg previously met at the Villa. This young man referred to Holmberg as "Sean

Evan." Holmberg paid the young man to provide them a tour around the city, after which he engaged in sexual activity with both Holmberg and CW2. CW2 also said that Holmberg later went to the brothel, but CW2 chose to stay back. Upon his return, Holmberg shard stories with CW2 about his sexual exploits with young males. Although CW2 was not aware of their ages, he knew that Holmberg preferred underage boys.

More recently, HSI and BCI investigators identified two Slovakian men ("PH" and "LP") who were familiar with Holmberg, one of whom who previously worked at the Villa Mansland. Both these young men had a relationship with Holmberg whom they only knew as "Sean Evan." The older of the men first met Holmberg while he worked at the Villa Mansland in 2011, when PH would have been 22 years of age. PH confirmed that the Villa Mansland had male prostitutes, and on one occasion, PH told HSI and BCI agents that Holmberg asked him to arrange a "boy" for him. PH also admitted to telling Holmberg about a park located near the railroad station, where Holmberg could expect to find young male prostitutes.

In May 2024, investigators also interviewed LP, a young Slovakian man to whom Holmberg sent numerous sexually explicit images via Viber, an end-to-end encryption platform. These images depicted both adolescent-age boys as well as young adult males, including a young adult male from North Dakota. LP acknowledged meeting Holmberg on at least two occasions and receiving images of adolescent-age boys from Holmberg whom he only knew as "Sean." LP reported that Holmberg requested him to find a boy for the purpose of sex, but he declined to do so. For instance, on May 13, 2019, LP wrote via Viber:

**LP:** "What you doing today?

**Holmberg:** I like suckling

**LP:** Oh

**Holmberg:** Only on young blonde boys"

7

Later, on July 25, 2019, Holmberg wrote LP that he had two requirements before he would travel to Slovakia:

> **Holmberg:** "There are only two requirements that I have to come and visit you soon. The airplane ticket must be a reasonable price, **and you have to guarantee that I will have a boy to have sex with when I am there.**

Again, on July 29, 2021, Holmberg wrote that perhaps he could find his own boy while in Prague. Specifically, Holmberg wrote: "I have family members who I have promised to buy crystal for. I do not mind being in Prague alone. **Maybe I will find a boy.**" During this same conversation, Holmberg also wrote that perhaps he also could find a boy in Slovakia, where LP resided: **"Maybe I will find a boy in kosiche."**

Finally, on September 20, 2021, Holmberg asked LP whether he engaged in sexual activity with a boy, to which LP responded:

> **Holmberg:** "have you ever fucked a boy?
>
> **LP:** No
>
> **Holmberg:** it feels awesome. much better than in a napkin."

The boys and young men with whom Holmberg sought to engage in commercial sex were some of the most vulnerable in the world. Especially in Prague, they were homeless boys and men often recruited to work at the Villa by its owner because of their vulnerabilities. One such email Holmberg received and forwarded to CW1 on June 18, 2011, entitled "Travel report of Harry to varies [sic] Eastern countries," details the Villa Mansland's owner's travels throughout Eastern Europe during which the owner, identified only as Harry, photographs himself with various adolescent-age boys. The owner made clear that he had already invited some of these boys--who were depicted in the images he sent to Holmberg--to join him in Prague at the Villa. Holmberg also forwarded CW1 images of young males that were in the Villa Mansland's newsletter, but some of these images were not recovered during the forensic examination. For

8

instance, on June 20, 2011, Holmberg sent CW1 the following email: "here are the two I really liked....especially the first one...(I would definitely tour him) they were in latest [newsletter] from the Villa, but I tried to forward them, but it didn't work."  In an email, dated June 21, 2011, Holmberg explained to CW1 that he saw only three images.  "Didn't like Jiri but loved Remus. Other dude ok. I loved to be sucked."

The forensic examination of Holmberg's device and email account also revealed that he had direct communications with employees of the Villa Mansland following his and CW1's July 2011 trip to Prague.  On September 1, 2011, one such employee wrote to Holmberg that he was the new "office manager at Prague's unique gay resort Villa Mansland."  The office manager explained that the Villa was a place where older and younger "guys" meet and he invited Holmberg to Skype him. In another email, dated September 5, 2011, the office manager thanked Holmberg and others who Skyped him after his last message.  The office manager told Holmberg he was looking forward to seeing him in person and he told him about a guest at the Villa who requested to use the whirlpool bath in the Wellness Center "with a couple of boys he'd met here [at the Villa Mansland]!"  Continuing that same day, Holmberg forwarded these emails to CW1 and asked: "where were these dudes when we were there?"

In addition, SA Smith recovered emails which reflect Holmberg's consciousness of guilt. On July 25, 2012, Holmberg forwarded an email to CW1 entitled "Caution—Police raided Villa Mansland is Imminent!" The original email sent to Villa friends read, in part: "due to the suspicion of commercial prostitution and drug abuse was found in the next few weeks, a police raid in house of Villa Mansland.  To avoid being implicated in it you should avoid the house!" Hours later, the owner of the Villa Mansland sent Holmberg, and others, an email explaining that he never sent the above-mentioned email about a police raid.  The owner explained that he suspected a competitor sent the email and he welcomed all to return to the Villa Mansland.

Holmberg immediately forwarded this email to CW1, writing "Thank God," which reveals that he considered himself fortunate to not have been caught up in any police raid involving criminal activity.

Finally, the investigation revealed that Holmberg routinely bragged to a select group of trusted individuals about his sexual exploitation of boys. For instance, on February 21, 2011, Holmberg emailed his longtime friend an image of an adolescent-age boy and posed the following question: "what think of my twink?" In response, his friend responded that "the twink" was too young for him and Holmberg in turn wrote: **"no one is ever to [sic] young … remember Prague."** In another instance, Holmberg emailed CW1 on his return flight from Amsterdam to Minneapolis on July 5, 2011: **"Got rewarded for my sins in Prague. Upgraded from Amsterdam to MSP."** The only reasonable inference that can be drawn from these comments is that Holmberg was boasting about his engaging in sexual activity with young boys in Prague.

Then, while in Prague in 2015, Holmberg emailed his longtime friend two images of the same young male. In the email, dated October 30, 2015, Holmberg wrote that he "had 45 minutes with this specimen," referring to the young male in the images. Simply put, Holmberg was celebrating his most recent conquest with his trusted friend.

Likewise, Holmberg discussed his exploits with those he victimized in North Dakota. In 2012, Holmberg told SS, a former student of Holmberg's, that "you'd be amazed what you could do with a 12-year-old boy in . . . ." a foreign country which he could not remember. At Holmberg's invitation, SS joined Holmberg at a political event in Bismarck. SS spent the night in Holmberg's hotel room and in the morning, he awoke to Holmberg performing fellatio on him. SS never consented to this activity, and he immediately took steps to leave during which time Homberg made the reprehensible comment about his traveling to a foreign country to

engage in sex with a 12-year-old boy. Holmberg's conduct in this instance reflects that he sincerely believed his being in a position of power shielded him from the consequences of his actions while in Prague. By 2012, Holmberg had already traveled to Prague on four occasions, not to mention dozens of other foreign countries and he was no doubt embolden by the belief that he continued to get away with his criminal conduct time after time, trip after trip.

During the investigation of Morgan-Derosier, HSI interviewed several of his adolescent-age employees, some of whom engaged in commercial sex with Holmberg. One such employee, BLT, reported that Holmberg paid him for massages. After BLT quit working for Morgan-Derosier because he was not getting paid, he returned to Northern Minnesota where Holmberg drove to pick him up and return him to Grand Forks for the purpose of their engaging in commercial sex. Facebook Messenger chats between BLT and Holmberg corroborated BLT's statement and Holmberg later admitted to the same. During this incident, BLT told SA Casetta that he recalled Holmberg telling him that he wanted to go to Peru or Prague "to fuck 15-year-old boys."

Holmberg often told sex workers about the purpose of his travels to Prague. For example, he emailed a sex worker who was seemingly in Virginia: **"**love your look and comments. **I'm in Prague, where the age of consent is 16. Lol.** Just got here for a months stay. If you send me email I will contact you when I get back. Lots of sinning in Prague." He made similar statements in his communications with other yet unidentified individuals.

It is impossible to know how many boys Holmberg victimized in Prague and elsewhere because law enforcement was not able to identify them, in part, because his visits spanned more than a decade and they were homeless runaways who often lived in poverty. But, make no mistake, this is not a victimless crime. There is no doubt that Holmberg's exploitation of them has had devastating consequences for them, which are long-lasting.

B.     **The History and Characteristics of the Defendant**

Holmberg's criminal activity was not limited to his traveling to Prague for the purpose of engaging in commercial sex with underage boys.  He also used online deception and trickery to mislead and manipulate a 16-year-old Canadian boy to produce images depicting himself engaged in sexually explicit conduct.  In addition, Holmberg has a long history of leveraging his power and influence as a North Dakota Legislator over young men to obtain sexual favors.  The United States requests the Court weigh these facts in determining the appropriate sentence.

1.    **Catphishing Scheme**

SA Smith discovered communications between Holmberg, using the seanevan@hotmail.com email account and a 16-year-old user on the online chat forum "teen boys pro circumcision@yahoogroups. com." Holmberg found his victim in this chatroom that was a dedicated virtual space for teenage boys who had just undergone a circumcision surgery. On November 24, 2012, the boy posted to the group: "Hello, Im [BH] I am so happy to be apart of the group. Im 16, and i was just circumcised last summer."  He went on to discuss the surgery. In response, Holmberg congratulated him and wrote the following: ". . . tell me about the pain and sensation problems. That's what I fear and holds me back. am thinking of having it done as an 18th birthday present to myself." Holmberg then went on to further mislead BH about his true identify.

Eventually, Holmberg began emailing BH directly, even requesting pictures of him.  BH responded, in part: "**Im 16,** but again i don't know how this would be classified. Exposure or porn. I think exposure. as long as [it] stays within the group and no one makes copys [sic] I think it would be ok. can you send me the moderator email?" Holmberg, all while representing he was of like age, continued to ask BH about the procedure and he later asked him whether his circumcision affected his masturbating, his orgasms and later Holmberg asked about the length

of BH's "dick?" In many instances, BH, who was clearly naïve and vulnerable, was evidently uncomfortable with these questions.

Holmberg and BH continued to exchange emails during which BH revealed he suffered from low self-esteem, bad acne, and bullying. Holmberg shared that he too was an adolescent suffering from many of these same struggles, including bullying and bad acne. Holmberg later wrote: "look forward to seeing as much of you as you want. (remember, I dared showed pubes... LOL)."

After Holmberg requested BH to send him another photo, BH wrote "**Sure but im 16 and u do the same.**"  BH sent Holmberg a photo of himself, and Holmberg wrote that BH was "very good looking."  At Holmberg's repeated request, BH continued to send Holmberg photos of himself, including an image of BH bare-chested.  During their online conversations, BH complained about being too thin and hairless, both of which Holmberg wrote that he preferred. Relentless in his request for more pictures of BH, Holmberg continued to write:

- "How are you coming on more pictures?"

- "Did you forget about me, or hate me?"

- "How you coming on other pics? So looking forward to them."

- "Any more pics yet? Looking forward to it. "

- "You can go ahead and send any pictures you wl [sic] will let you know what I think"

- "This is a picture from my balcony two nights ago in Miami Beach. [image.jpeg] Please send me thos [sic] pics of you. Do you wanna see mine?"

- "Originally you were going to send some pictures of your dick and I said maybe not but I think it's fine and I'd love to see them."

Holmberg and BH exchanged emails for months, and eventually Holmberg asked BH "how do you jack?" and "you ever taste your cum?" To convince BH to produce and send sexually explicit images of himself, Holmberg sent an image of a penis that he represented was his and then

wrote that it was BH's turn to share. That same day, BH sent Holmberg an image of his penis. Holmberg immediately responded "Awesome cock bro. The scar will recede over time. Bet it's an interesting feel however."

Holmberg continued to persistently request more pictures of BH all under the guise that he was concerned about his surgery. Upon receiving an image of BH's penis, Holmberg responded: "Awesome, your healing is coming along very well. Your scar will be less pronounced over time. Here's another of mine. I will erase yours, thanks, and feel free to send more." Eventually, Holmberg told BH he traveled a lot and inquired whether "it's possible we could ever meet?" BH replied that it depended, but that he would be more likely to meet with Holmberg after BH turned 17. Holmberg remained in contact with BH, and BH continued to send Holmberg pictures of his genitals at Holmberg's request.

On March 5, 2013, Holmberg seemingly frightened sent a final email requesting BH to erase his communications: "Delete all my emails, received and sent and all contact info. In about a week I will contact you through different account. You will know it's me by what I say."

HSI and BCI agents later identified BH, a Canadian resident, but sadly they were never able to interview him because he took his own life in 2021. However, HSI and Canadian law enforcement interviewed BH's stepfather who resides in Alberta and who positively identified BH in the images that were recovered from Holmberg's email account.

This catfishing scheme demonstrates Holmberg's sophisticated and skillful grooming techniques. Using a fake name, and misrepresenting his age and likeness, Holmberg was able to successfully convince a vulnerable and confused 16-year-old boy to produce sexually explicit images of himself for Holmberg's sexual pleasure. This didn't happen overnight, and it didn't happen without patience. Holmberg first went looking for such a boy in a chat room that was dedicated to young boys who had just undergone a circumcision procedure. And then Holmberg,

using skills he likely developed and honed as a high school counselor, listened to his problems, including his concerns about his dying cat, thereby gaining a vulnerable boy's trust.  Throughout their online relationship, Holmberg requested images that were at first seemingly innocent and later, using deception, he convinced him to create lascivious images of himself.  Unfortunately, law enforcement was never able to learn what became of their relationship because BH eventually took his own life, but no doubt Holmberg's conduct contributed to his struggles.

### 2.  Holmberg's Abuse of Power

Even before Holmberg began traveling to Prague, he sexually exploited adolescent-age men throughout this country, some of whom he began grooming when they were underage students at Grand Forks Central High School and others over whom he leveraged his influence and power to obtain sexual favors while attending the University of North Dakota.  There is one obvious and consequential fact that put him in position to do this: Holmberg was an elected official at the time of all this conduct, which allowed a man of such advanced age to successfully solicit young men as young as 18 and 19 years of age.  That is, he was an elected official and the Chairman of Appropriations, no less--arguably the most powerful legislator in North Dakota. These circumstances provided him (1) with a purpose and means to be physically present in so many cities across the country, where he routinely engaged in commercial sex with young men and (2) with power and influence that he leveraged over consenting young men for sexual favors who were nonetheless vulnerable.

For instance, Holmberg, using his alias email account seanevan@hotmail.com, wrote to another unidentified user who seemingly was aware of his true identity:

> "**Had a great legislative forum yesterday in which I got blowjobs from Republicans and Democrats for all the power I have.**
>
> The appropriate response is 'aw shucks.' **I learned a long time ago the more power you have the more you have to use it sparingly and discreetly.**  The previous chairman of

appropriations was ham-handed and greedy in his approach to power, and was removed as chairman.

We have roughly 20 days left of the session.  If we get done early, I fear for you guys because I am sure to come up with some reasons/excuses to come and visit.  I might drive to Champaign, but would fly to Georgia.

**I will stay in power as long as I don't get caught in a motel room with a 17-year-old boy.**  Sigh.  This is just like being in the garden of Eden.  The most delicious fruit from the tree of good and evil is forbidden. . . ."

Importantly, Holmberg engaged in countless acts of commercial sex with young men while traveling around the world.  The forensic examination of his devices and email account revealed that he made arrangements on countless occasions to engage in commercial sex in cities as near as Fargo and Bismarck and as far away as London, Boston, Chicago, Phoenix, and Washington DC, among other cities—often during the time that he was traveling for state business.  The following is just a smattering of these arrangements:

- On November 20, 2007, using his alias seanevan@hotmail.com email account, Holmberg

  wrote:

  Subject: hey, from Sean at the Ritz Carlton

  Johnny,

  Had a great time with you.  You are a beautiful boy, who needs someone to take care of him, hold him gently, and yes, fuck his boy pussy.

  That was an awesome boy pussy you have. . . .  If you are around when I get back to Maimai [Sic] Beach in January, I hope we can get together and decide what to do.

- On November 22, 2008, Holmberg wrote his friend and asked him which sex

  worker in California he should hire:  "the one is $120 and I have enough cash.  This one I don't

  know his price.  Won't pay more than that, but think this dude IS beyond my price range.  BTW

  are you going to 'scrub' your phone before your trip to DC?

- On August 31, 2009, Holmberg wrote his longtime friend "our kinda guy" to

which his friend responded, "little young."  Holmberg in turn responded: "old enough to bleed.. old enough to butcher. . . oh wait . .  that might now [sic] apply to dudes. Lol."

- On October 24, 2009, Holmberg planned to meet with a sex worker at his hotel in Chicago located at "900 block of Michigan."  He wrote: "I'm at conference but can sneak way for a time, no problem. . . I don't have constant contact through Hotmail. . . texting would work for me if it's okay for you. . 701-739-5334 hope to 'meat' you soon. . lol." Additional messages infer they met for the purpose of commercial sex.

- On July 1, 2012, Holmberg reached out to a sex worker he had met at the Candlewood Suites by the Fargodome the preceding summer by writing: "We hooked up at candelwood suits and it was awesome. You ok for another discreet visit?"

- On September 25, 2012, Holmberg wrote another of his friends that he just hired the services of a sex worker while traveling in China: "I had great massage for ¥200.  Was excellent with very happy ending.  He was like 130 lbs. smaller equipment but huge huge load. This hotel is ¥2,800 per night. Corporate rate."  In response his friend wrote: "Well you're probably on you're way to my Second Home City, Hong Kong.  You're going to love HK!! Immediately you will notice you're not in Kansas anymore, Kansas of course being China.  If you haven't be [sic]."

- On September 4, 2013, Holmberg invited a sex worker to his hotel in Las Vegas: "Embassy suites, 4315 Swenson St., Room 628.  Just come and knock.  I'll be in bed reading."

- On August 13, 2013, Holmberg sent his longtime friend an image of an adolescent-age masseuse to which his friend replied: "Did you drug him?  Is he legal?  And if so, which countries?"  In response, Holmberg wrote: "Gotta pay him 80 bones. But just too cute.  He says he's 19.  I believe him. CList. M4M then add massage.  Must be code for pay. Lol"

- On August 28, 2013, Holmberg sent the following in response to an online

17

advertisement: "Im in Bismarck tonight at Kelly. does $100 seem reasonable? as late as you want. I get there about 5:00 pm and have a dinner from 7-9:00 pm then back at hotel."

- On September 10, 2014, Holmberg negotiated the following with a sex worker identified as a "full time student": "I am off to dinner. Back by about 8:30. $60 plus transportation. What will that cost? Sean" The worker responded "120," to which Holmberg in turn responded "Sounds ok. Look forward to great time. 9:00 to be sure?"

- On November 19, 2014, Holmberg using Craigslist, solicited a sex worker to come to his hotel in Scottsdale, Arizona: "Excellent. Going to reception and be back in room by 7:15. I've been flying most of the day and really need an erotic massage.  What is your fee for an awesome time? I'm at Fairmont Scottsdale Princess.  Awesome room."

- Four days later, while still in Scottsdale, Arizona, Holmberg arranged for yet another sex worker to come to his hotel.  The sex worker eventually wrote over Craigslist: "Hope you enjoyed yesterday's massage."

- On September 15, 2015, Holmberg wrote over Craigslist:  "I have a dinner so it would be 930.  The hotel has secure elevator so we would have to meet downstairs, nothing like a exotic message with happy ending to complete a day of sitting at meetings."

- On December 8, 2015, Holmberg responded to a sex worker via a Craigslist Ad in Washington, D.C. for "The Right Touch – m4m" by stating: "I'm interested. Staying at Marriott Wardman Park. Nice king bed. Interested in erotic massage. Cost?" The worker responded, "Hi, ok what time would you like me to come over? It's 120 for the hour." Holmberg affirmed the request by responding, "The sooner the better. I've been flying all day."

This ongoing activity—in city after city, year after year—not only demonstrates Holmberg's proclivity for young sex workers, but it also reflects his true purpose in traveling to Prague.  That is, he did not repeatedly travel to Prague to engage in commercial sex with young

men as he was already engaging in this very activity on hundreds of occasions in dozens of cities throughout the United States. He traveled to Prague because he had a sexual interest that could not be legally met in the United States: underage boys. As such, he mostly limited his hands-on offending of underage boys while traveling abroad where he believed he could get away with it. Nevertheless, his use of domestic sex workers has also contributed to the demand for illegal sex trafficking because buyers of sex, such as Holmberg, do not distinguish between willing sex workers and those who are being trafficked by force, fraud or coercion.

### 3.  Holmberg's Past Exploitation of Young Boys and Men in North Dakota

Although most of Holmberg's hands-on offending of underage boys was limited to Prague, where he knew he could get away with it, he nonetheless still preyed on vulnerable young boys and young men while in North Dakota.

Investigators first learned of allegations surrounding Holmberg's sexual interest in underage boys during an interview in May 2016. SS reported to the FBI in Spokane, Washington that he was victimized by Holmberg decades earlier when he was a student at Grand Forks Central High School. According to SS's victim impact statement, Holmberg began grooming him when he was a 16-year-old student at Grand Forks Central High School during a time when he was extremely vulnerable. During this time, SS was living in an abusive home, abusing drugs and alcohol and suffering from post-traumatic stress disorder—all of which Holmberg was aware as his guidance counselor. But rather than prioritizing SS's well-being and safety, Holmberg used the situation to manipulate SS. Holmberg presented himself to SS as a "trusted confidant," and consequently SS came to rely on Holmberg for stability and support. SS explained that Holmberg gave him attention that he did not receive at home, but it was not the type of attention one would expect to receive from a guidance counselor. Holmberg's attention of SS was a means to an end of sexually exploiting SS.

SS later moved to Washington and relapsed, at which point he reached out to Holmberg who sent him money—money which Holmberg knew would be used to support SS's drug habit. But the money did not come without expectations tied to it. After SS turned 17, Holmberg told him that he would give him money in exchange for SS producing videos of himself engaged in sexually explicit conduct. Using a camcorder provided to him by Holmberg, SS went on to record himself engaged in sexually explicit conduct. On one occasion, Holmberg even flew to Washington to film SS while engaged in such conduct. Eventually, these videos were recovered during the search warrant of Holmberg's residence and investigators flew to Washington to meet with SS. Although he could not definitely say whether he was underage in the videos, the videos nonetheless make clear that he wanted no part of what was happening. After having viewed these videos--produced nearly three decades earlier--SS explained that one video in particular haunts him because it depicts his younger self in obvious distress. To use SS's words: "it was not a consensual relationship," despite SS's age. Holmberg went on to exploit his relationship with this vulnerable young man for years. SS's victim-impact statement conveys his plight with Holmberg and the devastating consequences even years later. Holmberg's sexualization and objectification of his former student continues to have a long term psychological, emotional and physical impact on SS

There were other instances where Holmberg took advantage of vulnerable youth. In 2013, when Holmberg was 69 years of age, he solicited sex from RMJ, a 17-year-old boy who was attending Grand Forks Central High School. HSI investigators interviewed RMJ who reported that he met Holmberg whom he knew as "Sean" via a dating app. Holmberg invited RMJ to his condominium on at least two occasions during which time they engaged in sexual activity. On each occasion, Holmberg directed RMJ to park his vehicle in Holmberg's garage so as not to alert anyone that he was at the residence. During the first incident, RMJ was only 17

years of age when Holmberg gave him a "massage" that included sexual activity. And although there is some question about RMJ's age when they met on a second occasion for sex, he was nonetheless still attending high school. With the benefit of hindsight, RMJ recognizes their relationship as "sickening, gross, and disgusting."

Over the course of decades, Holmberg has also used his power and influence as a state senator to exploit young men who attended the University of North Dakota (UND). HSI investigators interviewed former UND students who reported that he leveraged influence as a legislator to obtain sexual favors. CW2 reported that he engaged in commercial sex with Holmberg over a three-year period while he was a student at UND. CW2 was indigent and he reported that he used the money he received from Holmberg for groceries and rent. Eventually, Holmberg ceased paying him cash in exchange for the sexual activity and instead brought him to UND hockey games, where together they sat in the President's Suite. These hockey tickets represented a right to access to some of the most influential people in the state; namely, the President of the University, and on occasion the Governor of North Dakota and the federal delegation. CW2 explained that if he accepted Holmberg's invitation to attend a UND hockey game as Holmberg's guest in the President's Suite, there was always an expectation that he would have to engage in sexual activity with Holmberg. Holmberg also invited this same UND student to occasionally travel with him during which time he would have access to VIPs. In each instance, CW2 stated that he was expected to engage in sexual activity with Holmberg in exchange for the travel.

Another former UND student stated that he engaged in sexual activity with Holmberg at Holmberg's longtime friend's residence more than twenty years ago when he was a student at UND. Even though he was not sexually interested in Holmberg, he maintained a relationship with him because he acknowledged that it would benefit his career. This was common practice

21

for Holmberg. He routinely implied that he was in a position to help these young men in exchange for their engaging in sexual activity with him.

### 4.  Holmberg's Past Exploitation of His Young Adult Staff

Holmberg's corruption extended to his staff hires. During the forensic examination of Holmberg's devices and email account, SA Smith located numerous conversations between Holmberg and various others about a young staff member employed by Holmberg. These conversations clearly reflects that Holmberg hired Cooperating Witness/Victim 3 (CW3) for the sole purpose of engaging in sexual activity with him.

Investigators interviewed CW3 who reported that he was working at a men's clothing store[2] in Bismarck when he met Holmberg. Holmberg came into the store to purchase a suit and thereafter Holmberg offered him a job as a consultant. On March 8, 2017, Holmberg, using corresponding email accounts holmbergforsenate@gmail.com and rholmberg@nd.gov, sent emails to an out-of-state lobbyist that corroborated CW3's report:

> **Holmberg:**  "I met him at [men's clothing store] way [sic] he's the guy who sells the clothes. When I was in Prague he was also traveling in Europe alone so we hung out in Prague for three days. He currently goes to school in Fargo, but comes to hockey games with me, and we go out and eat and things. Really a nice guy about 22 years old.
>
> **Lobbyist:**  Do you guys have sex?
>
> **Holmberg:** Not yet. Lol  Would you bed with him?
>
> **Lobbyist:** IDK. got a pic of him?
>
> **Holmberg:** He's funny And cute Sent you his 'G' rated pics
>
> **Lobbyist:** send the r pics
>
> **Holmberg:** They are 'R++'. I would need to use my Nephews account if that's ok."

---

[2] The name of the men's clothing store is not identified to protect the identity of CW3.

CW3 also reported that Holmberg brought him to political events throughout the United States and UND hockey games where, like many others, he gave this young man access to other VIPs. The investigation revealed that Holmberg requested free tickets from both NDSU and UND for various sporting events during which time he took CW3 as well as other young men as guests. Below are some of the emails that SA Smith recovered from Holmberg's devices:

- "[CW3] guest on Saturday."

- "1 guest Fright night at hockey will be [CW3]"

- "[CW3] at hockey tonight, [CW2] on Saturday."

- "[CW3] will be my guest Sept. 7th NDSU v. UND"

- "Saturday is [CW3], Friday is [CW2]"

- "[CW3] again. Sorry."

- "[CW3] will be my guest."

- "Thank you so much. We will see you. Ray and [CW3]."

- "[CW3] and [CW2] will by my guests. Can I get back as to which date they will be attending. I can't do Sunday."

- "Of course [CW3] will be "the guest""

According to CW3, Holmberg seemingly expected something in return from him in exchange for Holmberg introducing him to other people. CW3 also suspected that Holmberg was pandering him to other individuals who were also involved in politics because these other people began propositioning him.

The investigation further revealed that Holmberg flew CW3 to Boston, Massachusetts; San Juan, Porta Rico; San Diego and Los Angeles, California; Charleston, South Carolina; Fort Myers, Miami Beach, Naples, Florida; Phoenix, Arizona; Atlanta, Georgia; New Orleans, Louisiana; Albuquerque, New Mexico; Anchorage, Alaska; Chicago, Illinois; and Washington,

D.C.  CW3 reported that Holmberg paid for all these trips.  According to CW3, Holmberg also nominated CW3 to take a foreign trip paid for by Global Bridges, a program funded by the North Dakota Legislature.  Because of the COVID pandemic, however, CW3 reported that the trip was cancelled.  Global Bridges is the same state-subsidized program which funded at least one of Holmberg's trips to Prague.  Meanwhile, Holmberg told other individuals he had plans to engage in sexual activity with CW3—a young man who was paid with funds from Holmberg's campaign.  Holmberg wrote to another user, via Viber:

- ". . . Gonna fuck [CW3] now."

- "Sean fucking [CW3]"

- "I've got a peek at [CW3's] cock yesterday.  He was getting out of the shower.  It is so nice."

When interviewed by investigators, CW3 described an incident where he caught Holmberg spying on him while showering in a hotel bathroom, thereby corroborating the above email.

CW3 also told investigators that during the time that he worked for Holmberg, CW3 received sexually explicit and racist material from Holmberg's seanevan@hotmail.com email account.  SA Smith located emails that corroborated CW3's report.  Although CW3 was uncomfortable receiving this material, he did not make it known to Holmberg because Holmberg made it clear to CW3 that he was vindicative and had influence and power in politics.

Holmberg's offending conduct over the course of decades—his catphishing scheme involving a 16-year-old boy and his leverage of power and authority as an elected official to sexually exploit young men and boys—can only be described as corruption.  That is, he used his position to serve his own ends.  He took international and domestic trips often paid for by the North Dakota Legislature all the while sexually exploiting young men and boys.  And when necessary, he gave young men access to other public officials in exchange for sex or made it

known that sex was expected in return for such access.  These are not the actions of a man with good character and the Court should weigh this relevant conduct in imposing sentence.

### 5.  Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The next factor that the district court must consider in imposing sentence is "the need for the sentence imposed . . . to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). This is often referred to as the "just desserts" concept, which should be reflected in all sentences.

Courts have long recognized that child sex crimes are among the most egregious of societal and criminal offenses. There are few defendants, who over the course of so many years, have sexually exploited so many young males, some of whom were as young as 13 years of age and nearly all of whom were disadvantage.  Holmberg treated these young boys as commodities, sending images of them to other like-minded individuals and inviting others to comment on whether the boys' attractiveness was worth the money charged in exchange for their services.

Even though investigators were not able to identity these boys, in large part because these activities took place in foreign countries, make no mistake that this is not a victimless crime. The crime occurred against boys who today are young men who are almost certainly experiencing psychological, emotional and physical injuries.  The Court only need look at the statements of the young men who Holmberg exploited in North Dakota decades ago to get confirmation of this fact.  All of these young men in North Dakota shared a common characteristic with the young men in Prague.  They were all disadvantaged youth, who suffered emotional and physical trauma and/or drug addiction, thereby making them more vulnerable to Holmberg's advances.  Holmberg admitted this much when he was interviewed by investigators immediately following the search of his residence.  When confronted with the uncontroverted evidence that he was engaging in commercial sex with Morgan-Derosier's employees and a

former student, he explained that they were either "troubled" or they were addicted to drugs as justification for his conduct.  And when asked about his traveling to a foreign country to engage in commercial sex with young boys, he explained as justification for his conduct that it was legal to engage in commercial sex with underage boys in the Czech Republic.  It is not, but nonetheless his statements to this effect demonstrate that he fails to recognize the wrongfulness of his conduct: his traveling to another country for the sole purpose of engaging in commercial sex with underage, vulnerable boys.  To sentence Holmberg to a sentence of time-served would therefore be a travesty given his long history of sexually exploiting young boys and men.

### 6.  Need to Afford Adequate Deterrence and to Protect the Public

Finally, the Court must consider the need for the sentence imposed to afford adequate deterrence to criminal conduct and the need for the sentence to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(B) & (C).  The former factor concerns general deterrence, and the latter factor concerns specific deterrence and incapacitation.

The deterrence objective of sentencing is particularly compelling in a case such as this because other well-resourced men are committing child sex tourism offenses with the expectation that their conduct will never be discovered, investigated nor prosecuted.  To impose a sentence of time-served would represent a missed opportunity to deter criminal conduct that directly impacts the health and welfare of children located in other countries.  A term of imprisonment therefore should be imposed to engender respect for the laws that specifically criminalize United States citizens from traveling to foreign countries for the purpose of sexually abusing children, no matter if such countries have laws that also prohibit such conduct.

Sentencing Holmberg to a time-served sentence would also create an unacceptable risk to the community.  Despite his advanced age, he continues to pose a danger to underage boys.  As recent as 2021, Holmberg traveled to Slovakia and the Czech Republic during which time he

26

specifically requested other individuals to find him a boy with whom he could engage in sexual activity.  Specifically, Holmberg expressly requested LP to find him a boy in advance of his travels and he sent LP images of adolescent-age boys.  Then, on September 20, 2021, Holmberg told LP that he had engaged in sex with a boy. The facts of this case make clear that he is not too old to continue offending against young boys.

In addition, Holmberg continued to send images of young boys to PH and LP in Slovakia via Viber, thereby demonstrating his sexual interest in young boys which is a risk factor for recidivism.  And lastly, Holmberg continued to persistently engage in commercial sex with young men up until his arrest in North Dakota.  Twenty-year-old BLT, one of several of Morgan-Derosier's employees, told SA Casetta that he engaged in sexual activity as recent as July 2021, mere months before the search warrant was executed at his residence. Facebook Messenger conversations between BLT and Holmberg corroborated that Holmberg made plans to drive to Minnesota to pick up BLT in July 2021.  Later, Holmberg would admit to picking up BLT in Minnesota and returning him to North Dakota where they engaged in commercial sex.

In the end, Holmberg's long history of exploiting young boys illustrates an obvious picture of what Holmberg's likely recidivism would be like: near-certain victimization of vulnerable underage boys and adolescent-age men.  Given the risk of future harm to the public if his predatory conduct is not stymied, a term of meaningful imprisonment must be imposed to engender respect for the laws that prohibit United States citizens from traveling in foreign commerce for the purpose of engaging in commercial sex with children and deter others from engaging in similar criminal conduct.

### III.    CONCLUSION

When the Court considers all the factors enumerated in 18 U.S.C. § 3553(a), and the Guidelines, a term of imprisonment of 37 months followed by a lifetime period of supervised

release is the reasonable and just sentence. Such a sentence generally deters the behavior

exemplified by Holmberg, imposes a reasonable sentence given his criminal conduct, imposes a

sentence that will promote respect for the law, considers the kinds of sentences available and the

sentencing range established by the Guidelines, will protect the public from further crimes of

Holmberg, and avoids unwarranted sentencing disparities among similarly situated defendants.

Dated March 19, 2025

> JENNIFER KLEMETSRUD PUHL
> Acting United States Attorney
>
>
> By:      */s/ Jennifer Klemetsrud Puhl*
> JENNIFER KLEMETSRUD PUHL
> Acting United States Attorney
> ND Bar ID 05672
> 655 First Avenue North, Suite 250
> Fargo, ND  58102-4932
> (701) 297-7400
> jennifer.puhl@usdoj.gov
> Attorney for United States